# EXHIBIT B

### AFFIDAVIT OF CLIFFORD W. HEDGES
### IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Clifford W. Hedges, being duly sworn, state as follows:

I. **INTRODUCTION**

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) Boston Division, Springfield Resident Agency, located at 155 Brookdale Drive, Springfield, Massachusetts. I have been an FBI Special Agent since January 4, 1987. I was employed as a police officer with the Dallas (TX) Police Department from 1981 until December 1986. My current duties include investigating corruption within the government of the City of Springfield, including program fraud and misappropriation of federal funds provided by Department of Housing and Urban Development(HUD), in violation of Title 18, United States Code, §§ 371, 1341, 1343, and 1346, among others.

2. I am a graduate of the University of Louisville, Louisville, Kentucky, with a Bachelor of Science degree in Criminal Justice (1981), and will receive a Master of Science in Communications and Information Management, 2002, which includes a speciality in Security Management, in four weeks from Bay Path College, Longmeadow, Massachusetts. During my career with the FBI, I have been personally involved in long term racke-teering investigations targeting organized crime, sophisticated Colombian Drug cartels and violent street and outlaw motorcycle gangs. I was also a Supervisory Special Agent (SSA) for 2 ½ years for the Western Massachusetts Gang Task Force and the New England Outlaw

Motorcycle Gang Task Force, both of which were designated as FBI Safe Streets initiatives.

3. The information set forth in this affidavit is based on my own investigation; my review of relevant documents obtained by myself or other Special Agents of the FBI and Department of Housing and Urban Development/Office of Inspector General HUD/OIG, and Auditors assigned to HUD/OIG; interviews conducted with cooperating witnesses and others, and my review of documents from these individuals. The above mentioned federal agencies are all involved in this joint investigation which focuses on the misappropriation of federal funds by Springfield Housing Authority (hereinafter "SHA") employees.

4. I make this affidavit in support of applications for search warrants authorizing the seizure of documents and other items which are evidence of violations of the statutes cited in ¶ 1, supra, from the following locations:

### Locations to be searched

A. 115 Mayfair Avenue, Springfield, MA, the residence of Ray Asselin, Sr. and Janet Asselin. 115 Mayfair Avenue is a two story brick house with the number 115 appearing above the front door. The residence has an attached carport.

B. 56 Stage Island Road, Chatham, MA, the vacation of home of the Asselin family. This residence is a two story Cape style house with gray shingles and blue shutters surrounded on three sides by water with a large, concrete retaining wall.

C. 16 Dwight Street, Springfield, MA, the residence of James Asselin and Anne Asselin. 16 Dwight

2

        Street is a blue/grey color with white trim, two-story single family home with a white front porch. It is the first home on the right off of White Street onto Dwight Street. The number 16 is in ceramic tile directly above the front door.

D. 40 Santa Maria Drive, Springfield, MA, the residence of Ray Asselin, Jr. and Lisa Asselin. 40 Santa Maria Drive is a two story light blue, Colonial house with the number 40 appearing below the front door. 40 Santa Maria Drive has a detached two car garage.

E. 518 Old Farms Road, Amherst, MA, the residence of Joseph Asselin and Melinda Asselin. 518 Old Farms Road is a two story brick and vinyl siding house with the number 518 appearing on a mailbox at the end of the driveway. The residence has an attached garage.

F. 140 Salli Circle, Ludlow, MA, the residence of Maria Serrazina. 140 Salli Circle is a two story brick house with the number 140 appearing to the right of the front door and on the mailbox. The residence has an attached two car garage.

G. 184 Bowles Park Extension, Springfield, MA, the residence of Christopher Asselin and Marilena Asselin. 184 Bowles Park Extension is a two story tan and white Colonial house with the number 184 appearing over the top of the front door. A garden shed within the fenced-in backyard is visible from the street.

H. Individual offices of Ray Asselin, Sr., Executive Director; and Arthur Sotirion, Assistant Executive Director; at the Springfield Housing Authority, located at 25 Saab Court, Springfield, Massachusetts.

## II. THE PRESENT INVESTIGATION AND WITNESSES

5. The grand jury located in Springfield, Massachusetts is currently conducting an investigation into criminal conduct at the Springfield Housing Authority (hereinafter "SHA"). The

3

Executive Director of SHA is currently Raymond Asselin, Sr. (hereinafter "Asselin, Sr."), and he has been employed by SHA since 1969. Arthur Sotirion is currently SHA's Assistant Executive Director in charge of Maintenance, and he has been employed by SHA since 1970.

6. In general, the mission of SHA is to develop, operate, and administer housing and housing assistance programs to provide safe, sanitary and decent housing for eligible applicants. In furtherance of that mission, SHA receives and has received over the years federal funds from the United States Department of Housing and Urban Development (hereafter "HUD"). SHA receives its funding based upon official budgeting reports, financial requests, and other information transmitted by SHA via wire and the mail to HUD.

7. Beginning in the late spring or summer, 2002, the FBI and HUD received information that Ray Asselin, Sr. had been misappropriating SHA funds and resources to pay for personal home improvements to his residence and the residences of his children. In addition, the FBI and HUD received information that Asselin, Sr. had been receiving kickbacks from SHA vendors to steer SHA contracts to those vendors.

### III. USE OF SHA RESOURCES FOR PERSONAL HOME IMPROVEMENTS

8. As a result of this information, I have interviewed a number of cooperating witnesses (hereinafter "CW"). CW-1 is a cooperating witness. CW-1 has personal knowledge of Asselin, Sr. using SHA resources and funds to pay for personal improvements to Asselin, Sr.'s residence and his children's residences. CW-1 advised me that Asselin, Sr. has five children: James Asselin, Raymond Asselin, Jr., Joseph Asselin, Maria Serrazina (nee Asselin), and Chris Asselin. Asselin, Sr. and his wife Janet reside at 115 Mayfair Avenue, Springfield, MA. James Asselin and his wife Anne reside at 16 Dwight Street, Springfield, MA. Raymond Asselin, Jr. and his wife Lisa reside at 40 Santa Maria Drive, Springfield, MA. Joseph Asselin and his wife Melinda currently reside at 518 Old Farm Road, Amherst, MA, and formerly resided at 421 Homestead Avenue, Holyoke, MA. Town of Amherst Board of Planning records show that Joseph Asselin constructed a new home in Amherst in 1997-1998. Maria Serrazina, his daughter, resides at 140 Salli Circle, Ludlow, MA. Chris Asselin and his wife Merylina reside at 184 Bowles Park Extension, Springfield, MA. CW-1 also stated that the Asselin family has owned a vacation home at 56 Stage Island Road, Chatham, MA for a number of years. Through independent investigation, I have confirmed that Asselin, Sr. owned 56 Stage Island Road from approximately the mid-1970s until approximately 2000 or 2001 at which time

5

Asselin, Sr. deeded 56 Stage Island Road to James Asselin.

9. CW-1 stated that CW-1 has personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements to his residence and his children's residences since 1987. CW-1 stated that CW-1 first learned that Asselin, Sr. used SHA employees and resources to perform this work in the mid to late 1980s when Asselin, Sr. told CW-1 that he could get SHA employees to perform home improvements jobs for CW-1. According to CW-1, Asselin, Sr. had a basket next to the rear door of his residence. CW-1 stated that whenever one of the children wanted or needed work done to their homes, the procedure was to place a note specifying the particular work that needed to be done in the basket, and then Asselin, Sr. would take care of the request. CW-1 knew about Asselin, Sr. using SHA resources to complete and pay for personal home improvement through direct observations and personal conversations with various Asselin family members.

10. CW-2 stated that CW-2 has personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements since approximately 1994 or 1995. CW-2 has been a SHA employee since 1981 and has been working in SHA's Purchasing Department since approximately 1987. CW-2 could not say exactly when Asselin, Sr. first started telling CW-2 to purchase and bill home improvement items to SHA,

6

but estimated 1994 or 1995 as the beginning time frame. CW-2 stated that the typical procedure was for Asselin, Sr. to call or visit CW-2 at CW-2's office at SHA and either orally or in writing instruct CW-2 to purchase and bill certain home improvement items to SHA. On September 20th, 2002, I met with CW-2, and CW-2 produced certain handwritten notes requesting the purchase of various items. CW-2 stated that these handwritten notes did not represent all of the requests that CW-2 has received from Asselin, Sr. CW-2 identified the authors of the handwritten notes as Asselin, Sr. and Asselin, Sr.'s wife, Janet Asselin. Some of the handwritten notes were undated, while others were dated within the time frame 1998 through 2002. CW-2 also pointed out that one of the requests had been faxed from Arthur Sotirion's fax machine. These handwritten notes listed various items, such as paint, wallpaper, lighting fixtures, power tools, and other items, that Asselin, Sr. or Janet Asselin wanted CW-2 to purchase. CW-2 stated that Asselin, Sr. would tell CW-2 to deliver the items to either his office or his personal residence.

11. CW-2 stated that CW-2 then went to a local supplier and purchased the requested item. CW-2 stated that many of the local suppliers had SHA accounts, and CW-2 would bill the requested items to SHA. CW-2 stated that CW-2 knew that it was wrong to do this, but that Asselin, Sr. made CW-2 feel as if CW-2 would lose

7

CW-2's job if CW-2 did not obey Asselin, Sr.'s requests. CW-2 picked up the requested items and then delivered them to Asselin, Sr.'s office or his personal residence. CW-2 did not know what happened to the requested items thereafter. CW-2 knew that many of the purchased items were not intended for SHA. As an example, CW-2 stated that SHA paints all of its apartment units off-white, yet the paint that Asselin, Sr. ordered was color paint.

12. CW-2 also recalled occasions when Asselin, Sr. would simply tell CW-2 that he was removing certain items out of inventory. CW-2 used as an example a wet-vac vacuum cleaner. CW-2 stated that Asselin, Sr. would call him and say that he was removing a wet-vac out of SHA stock. CW-2 stated that it was customary procedure to place SHA bar codes on items received by the purchasing department and placed into inventory. Therefore, any items removed from inventory that have not had the bar codes removed should be identifiable as SHA property.

13. CW-2 further advised that CW-2 only handles purchases up to a certain dollar limit, which CW-2 stated was $25,000.00. CW-2 stated that Arthur Sotirion is in charge of the large contracts put out to bid for SHA's vendors. CW-2 stated that only Sotirion and Asselin, Sr. handle the large contracts.

14. CW-3 stated that CW-3 has personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements since approximately

8

the late 1980s. CW-3 has been a full-time SHA employee since approximately the mid-1980s. CW-3 stated that beginning in the late 1980s, CW-3 would receive a telephone call from Asselin, Sr. or Arthur Sotirion, who would instruct CW-3 to go to a particular non-SHA property to perform a particular task. CW-3 stated that CW-3 performed these jobs on SHA time because it was made clear to CW-3 that Asselin, Sr. wanted the job done now.

15. CW-3 also had personal knowledge that Asselin, Sr. had used CW-4, another SHA employee, to construct and/or pay for home improvements at Asselin, Sr.'s personal residence, his children's personal residences, and the Asselin family Cape Cod vacation home. CW-3 knew this because Asselin, Sr. would call CW-3 and tell CW-3 that he had sent CW-4 to a particular non-SHA property and wanted CW-3 to cover for CW-4. CW-3 explained that Asselin, Sr. instructed CW-3 to punch CW-4's SHA timecard in and out so that it appeared that CW-4 was working on SHA property when in fact CW-4 was doing personal work for Asselin, Sr. and his family. CW-3 estimated that CW-3 had falsely punched CW-4's timecard more than 100 times.

16. CW-3 stated that the materials were usually waiting at whatever location CW-3 had been directed to perform personal work. CW-3 stated that the typical procedure was for Asselin, Sr. to call CW-3 and instruct CW-3 to obtain a color chart from SHA's local paint supplier. CW-3 would obtain the color chart

9

and drop the color chart off at Asselin, Sr.'s office. According to CW-3, Asselin, Sr. would contact CW-3 and tell CW-3 what color he wanted. CW-3 stated that he would go to SHA's local paint supplier and either sign for the paint at the store or get a purchase order from the Purchasing Department. CW-3 estimated that CW-3 signed for paint or obtained purchase orders for personal use paint 50 to 100 times.

17. CW-4 stated that CW-4 has personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements since approximately the late 1980s. CW-4 has been a SHA employee since approximately 1988 and began doing personal work for Asselin, Sr. in the early 1990s while assigned to the Riverview crew. CW-4 stated that the typical procedure was for Asselin, Sr. to contact CW-4 and instruct CW-4 what Asselin, Sr. wanted done. CW-4 acknowledged that many times CW-3 used to punch CW-4's SHA timecard in and out so that it appeared as if CW-4 was really working at SHA.

18. CW-5 has been employed at SHA since 1989. CW-5 has personal knowledge that Asselin, Sr. has used SHA funds and SHA labor for his personal residence, the Chatham vacation home, and his children's residences. CW-5 stated that Asselin, Sr. would advise CW-5 personally when Asselin, Sr. needed personal work done. CW-5 stated that Asselin, Sr. used one SHA employee in particular frequently, but this employee is now deceased. CW-5

10

stated that this employee carpeted the Chatham vacation home and performed a lot of carpentry work.

19. CW-6 stated that CW-6 had personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements since approximately 2001. CW-6 has been a full-time SHA employee since approximately 1998. CW-6 stated that beginning in 2001, CW-6 was reassigned to the Riverview crew. Riverview is the name of SHA's largest housing project, and Riverview, like other larger SHA housing projects, has its own maintenance crew. CW-6 stated that Arthur Sotirion is the boss of Riverview. CW-6 stated that he was told by the foreperson of the Riverview crew that Asselin, Sr. had to okay CW-6's reassignment to the Riverview crew because Asselin, Sr. only wanted the "right guys" working for the Riverview crew. CW-6 stated that CW-6 was not approached about doing personal work for the Asselins until CW-6 started working at Riverview.

20. CW-7 stated that CW-7 had personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements since approximately 1994. CW-7 has been a full-time SHA employee since approximately 1987. CW-7 stated that CW-7 was assigned to the Riverview crew during the time frame that CW-7 has performed personal work for Asselin, Sr. CW-7 stated that the typical procedure was for Asselin, Sr. to call CW-7 or personally visit CW-7 at Riverview

11

after CW-7 arrived at work at approximately 7:30 a.m. and tell CW-7 that he had a job that he wanted CW-7 to perform at a certain non-SHA location. CW-7 recalled that on several occasions, CW-7 recalled telling Asselin, Sr. that CW-7 would be more than happy to do the work on the weekend, but Asselin, Sr. told CW-7 that he wanted the jobs done now.

21. CW-8 stated that CW-8 had personal knowledge that Asselin, Sr. has been using SHA employees and SHA funds to construct and/or pay for home improvements. CW-8 has been a full-time SHA employee since approximately 1977. CW-8 stated that it was common knowledge that the Riverview crew performed personal work for Asselin, Sr. on SHA time.

22. CW-8 stated that in approximately 1998, CW-8 assumed the responsibilities of supervising the SHA painting crew. CW-8 was aware that two members of the SHA painting crew -- CW-3 and CW-4 -- performed personal work for Asselin, Sr. at the personal residences of Asselin, Sr., James Asselin, Asselin, Jr., Joseph Asselin, Maria Serrazina, and Chris Asselin as well as the Chatham vacation home. CW-8 stated that he personally talked to CW-4 and told CW-4 that if CW-4 was going to do personal work for Asselin, Sr., then CW-8 wanted Asselin, Sr. or Arthur Sotirion to call CW-8 so that CW-8 could keep track of CW-4's whereabouts. CW-8 stated that thereafter, Arthur Sotirion or Sotirion's secretary called CW-8 and told CW-8 to bill CW-4's time to the

Riverview project whenever CW-4 performed personal work for Asselin, Sr.

23. **Asselin, Sr.'s Personal Residence**

    A.  CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at his personal residence. CW-1 knew that Asselin, Sr. had his kitchen remodeled three years ago. According to CW-1, SHA employee Luis Serrazina installed the granite counter top and table. CW-1 knew that Asselin, Sr. also obtained a new refrigerator, stove, and dishwasher. CW-1 also knew that Asselin, Sr. had the interior painted, new rugs installed, and new wallpaper. CW-1 believed that SHA paid for all of these home improvements. CW-1 also stated that SHA supplied the water heater in Asselin, Sr.'s home. CW-1 also believed that Asselin, Sr.'s lawnmower and snowblower also came from SHA.

    B.  CW-3 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at his personal residence. CW-3 knew that CW-4 painted and wallpapered Asselin, Sr.'s personal residence on at least five occasions over the years on SHA time. CW-3 knew this because CW-3 falsely punched CW-4's timecard on those occasions. CW-3 recalled that CW-4 painted both the interior and exterior of Asselin, Sr.'s personal residence. CW-3 recalled that the wallpaper came from Serv-U, a hardware store at which SHA had an account.

13

C.  CW-4 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at his personal residence. CW-4 stated that CW-4 painted the exterior of Asselin, Sr.'s personal residence. CW-4 also recalled hanging wallpaper in Asselin, Sr.'s kitchen. CW-4 recalled that Asselin, Sr. typically obtained the wallpaper from Serv-U or P & S Paint Store, both of which had SHA accounts. CW-4 stated that the materials were waiting for him at Asselin, Sr.'s personal residence, and that CW-4 performed these jobs on SHA time.

D.  CW-5 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at his personal residence. CW-5 performed a number of odd jobs at Asselin, Sr.'s personal residence. This included mowing the lawn, doing plumbing work on the sinks, and putting in an outside faucet. All of this work was done on SHA time.

E.  CW-7 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at his personal residence. CW-7 stated sometime after 1994, Asselin, Sr. told CW-7 to replace the concrete grill pad at his residence. CW-7 stated that Asselin, Sr. directed CW-7 to a concrete business on Memorial Drive in West Springfield and told CW-7 to bill the concrete to SHA. CW-7 stated that CW-7 went to this concrete business and stated that CW-7 was there to pick up two yards of concrete for SHA. CW-7 stated that the concrete business

14

supplied a two yard concrete container to CW-7, who then transported the concrete to Asselin, Sr.'s personal residence. CW-7 then dug up the old concrete grill pad, poured the new pad, and returned the container to the concrete business. CW-7 stated that CW-7 did this work on company time.

24. **Asselin Family Chatham Vacation Home**

A. CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the Asselins' vacation home in Chatham, MA. CW-1 knew that a number of SHA employees had performed work at the Chatham vacation house. CW-1 identified these employees as CW-4 and CW-7. CW-1 stated that in approximately June, 2002, CW-1 observed John Spano, the owner of Valley Flooring, and several employees install brand new carpeting in the Cape home. CW-1 knew that Spano had contracts with SHA. Valley Flooring, Inc. is located in Springfield, MA.

B. CW-3 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Asselins' Chatham vacation home. CW-3 stated that Asselin, Sr. instructed CW-3 and CW-4 to go to the Chatham vacation home in order to do painting. CW-3 recalled that CW-3 and CW-4 spent four or five days painting the entire Chatham home. CW-3 stated that they did this on SHA time. CW-3 knew that CW-4 went down to the Chatham home and performed personal work on other occasions because CW-3 falsely punched CW-4's SHA timecard on those occasions.

15

   C.   While at the Chatham home, CW-3 recalled seeing a large, concrete retaining wall on the property. CW-3 stated that Asselin, Sr. told CW-3 that he had worked out a deal with Chicopee Concrete whereby Chicopee Concrete delivered ten truckloads of cement from Chicopee to the Chatham home for free in order to build the retaining wall.

   D.   CW-5 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the Asselins' vacation home in Chatham, MA. CW-5 recalled that the most recent work that CW-4 performed was several days after September 11th, 2001. CW-5 personally assisted CW-4 in painting the summer home on one occasion while on SHA time, and was aware of other occasions when CW-4 did so. CW-5 also did weather coating and patchwork on the concrete retaining wall at the Chatham vacation home on SHA time. CW-5 believed that CW-2 obtained the paint for the various painting projects. CW-5 remembered that for one job "we used Thompson Weather Sealer, which [CW-2] would have ordered special for this job." CW-5 also recalled that CW-5 painted the bottom of Asselin, Sr.'s boat on SHA time. CW-5 stated that the boat required a special type of marine type paint, and that CW-5 painted the boat at Asselin, Jr.'s residence. CW-5 did not know how the boat, which was normally kept at the Chathman vacation home, had been transported from Chatham to 40 Santa Maria Drive.

16

25. **James Asselin's Personal Residence**

A.  CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of James Asselin at 16 Dwight Street. CW-1 knew that SHA employees gutted 16 Dwight Road and installed woodwork, drywall, and a new bath. CW-1 also knew that Jerry Ledger, an electrician who did work for SHA, also re-wired James Asselin's residence. CW-1 further knew that SHA employees installed tile at 16 Dwight Street in the late 1980s. CW-1 knew that Asselin, Sr. obtained the tile through SHA, and had an SHA employee named Joseph Decaro perform the work on SHA time. CW-1 knew that James Asselin had his son's room re-painted by an SHA employee. CW-1 knew that Beaulieu Roofing and Siding installed a new roof at 16 Dwight Street. Beaulieu Roofing and Siding had a contract with SHA, and CW-1 believed that the new roof was a payment for Beaulieu having received an SHA contract. CW-1 knew that James Asselin never paid for the roof. CW-1 also knew that James Asselin had new windows installed at 16 Dwight Street within the past two to five years. CW-1 stated that James Asselin did not have to pay for the windows. CW-1 also recalled that Valley Flooring installed new rugs at 16 Dwight Road. Finally, CW-1 also believed that James Asselin's water heater, lawnmower and snowblower also came from SHA.

B.  CW-4 stated that Asselin, Sr. used SHA resources

17

to complete and pay for home improvements at James Asselin's personal residence. CW-4 stated that CW-4 hung wallpaper at James Asselin's personal residence. CW-4 also recalled doing extensive painting at his residence. This involved both prep work and actual painting. Finally, CW-4 also recalled doing window repairs at James Asselin's home. CW-4 performed these jobs on SHA time.

    C. CW-6 knew that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of James Asselin at 16 Dwight Street. CW-6 stated that sometime in 2001 or 2002, CW-6 and CW-8 went to James Asselin's personal residence and installed bathroom vents. CW-6 stated that they did this on SHA time.

    D. CW-7 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at James Asselin's personal residence. CW-7 stated that CW-7 painted at James Asselin's personal residence on several different occasions since approximately 1994. CW-7 stated that the paint was at the residence when CW-7 arrived, and that CW-7 performed this work on SHA time.

    E. CW-8 also confirmed that Asselin, Sr. used SHA resources to complete and pay for home improvements at James Asselin's personal residence. CW-8 knew that an entire SHA painting crew painted the exterior of James Asselin's residence

on SHA time and used SHA scaffolding within the past five years. CW-8 personally videotaped the painting in order to document the use of SHA employees for personal work by Asselin, Sr. CW-8 is currently searching for the videotape.

26. **Asselin, Jr.'s Personal Residence**

A. CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of Asselin, Jr. at 40 Santa Maria Drive. CW-1 stated that SHA employees installed tile at 40 Santa Maria Drive in the late 1980s. Asselin, Sr. again obtained the tile through SHA, and had SHA employee Joseph Decaro perform the work on SHA time. CW-1 also stated that SHA employee Ray Descoteau painted several rooms and installed wallpaper borders within several rooms at 40 Santa Maria Drive. CW-1 stated that SHA had an account at Serv-U, and that the materials were ordered through Serv-U. CW-1 knew that Beaulieu Roofing and Siding installed a new roof at 40 Santa Maria Drive. CW-1 knew that Asselin, Jr. never paid for the roof, and believed that the new roof was part of the payment by Beaulieu for having received an SHA contract. CW-1 also knew that Asselin, Jr. had new windows installed at 40 Santa Maria Drive within the past two to five years. CW-1 knew that Asselin, Jr. never paid for the windows. Finally, CW-1 also stated that SHA supplied Asselin, Jr. with his water heater, lawnmower, and snowblower.