B. On August 8th, 2002, CW-1 recorded a conversation with Asselin, Jr. I have personally listened to that recorded conversation. During this conversation, Asselin, Jr. discussed the criminal investigation and commented about ripping the serial numbers off the water heater. Minutes later, Asselin, Jr. gathered personal documents, including one that Asselin, Jr. identified as bearing Janet Asselin's handwriting and relating to wallpaper in the bathroom, and could be heard shredding the documents. CW-1 ultimately convinced Asselin, Jr. to stop shredding documents as he could get in more trouble.

C. On August 21st, 2002, CW-1 recorded a conversation with Asselin, Sr. and Asselin, Jr. I have personally listened to that recorded conversation. During this conversation, Asselin, Sr. and Asselin, Jr. discussed the criminal investiga-tion and talked about gathering the paint in their houses and disposing of the paint in a dumpster outside one of the SHA projects. Asselin, Jr. then asked Asselin, Sr. about the snowblower, and Asselin, Sr. told Asselin, Jr. that he should get the snowblower out of the house also.

D. During this August 21st, 2002 conversation, Asselin, Sr. and Asselin, Jr. also discussed the fact that a certain SHA employee had built Asselin, Jr.'s deck. Asselin, Sr. and Asselin, Jr. agreed that if questioned about this project, the answer would be that the SHA employee, who is now deceased,

20

was paid in cash by Asselin, Jr. CW-1 knew that this was not true. CW-1 has advised me that CW-1 has been present for several conversations in which Asselin, Sr. and other Asselin family members discussed the fact that if various Asselin family members, including Asselin, Sr., were questioned about these various home improvements projects, they would state that Asselin, Sr. personlly paid for the materials and projects, which CW-1 knew to be false.

    E. CW-4 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Asselin, Jr.'s personal residence. CW-4 stated that CW-4 hung wallpaper at Asselin, Jr.'s personal residence on at least one occasion. CW-4 also recalled having painted the garage doors at Asselin, Jr.'s residence. CW-4 performed these jobs on SHA time.

    F. CW-7 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Asselin, Jr.'s personal residence. CW-7 stated that CW-7 painted the side steps at Asselin, Jr.'s residence. CW-7 stated that the paint was at the residence when CW-7 arrived, and that CW-7 performed this work on SHA time.

27. **Joseph Asselin's Personal Residence**

    A. CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of Joseph Asselin. CW-1 knew that Joseph Asselin had constructed a

brand new home in Amherst in 1997. CW-1 believed that Asselin, Sr. had "helped" Joseph Asselin by supplying a brand new banister and a new rug for the home.

    B. On August 8th, 2002, CW-1 recorded a conversation with Asselin, Jr. during which Asselin, Jr. discussed the "help" that Asselin, Sr. gave Joseph Asselin towards the construction of the new home. I have personally listened to that recorded conversation. Asselin, Jr. stated that he knew that Asselin, Sr. had "helped" Joseph Asselin a lot with the construction of the new home. This help, according to Asselin, Jr., included wiring Joseph Asselin's house for free and the installation of plumbing. Asselin, Jr. stated that the work for Joseph Asselin's home was probably "tacked onto another job", and that it would be difficult to track.

    C. CW-3 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Joseph Asselin's personal residence. CW-3 stated that CW-3 and CW-4 stained Joseph Asselin's deck at his old home in Holyoke. CW-3 also knew that CW-4 did all of the painting and wallpapering for Joseph Asselin's new residence in Amherst, Massachusetts.

    D. CW-4 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Joseph Asselin's personal residences. CW-4 stated that CW-4 did a small amount of painting at his Holyoke residence. CW-4, however, stated that

22

CW-4 did all of the painting for Joseph Asselin's new home in Amherst. CW-4 performed these jobs on SHA time.

  E. CW-5 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Joseph Asselin's personal residences. CW-5 stated that CW-5 personally sheetrocked the basement of the Amherst residence, and that the sheetrock was waiting for CW-5 when CW-5 arrived. CW-5 received assistance from two other SHA employees. CW-5 also stated that CW-5 did much of the cleanup during the construction of Joseph Asselin's home. CW-5 and the two other SHA employees performed these jobs on SHA time.

  F. CW-7 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Joseph Asselin's personal residences. CW-7 stated that CW-7 painted several rooms at his Holyoke residence on one occasion. CW-7 stated that the paint was located at his residence when CW-7 arrived, and that CW-7 performed this work on SHA time. CW-7 recalled that Joseph Asselin was getting ready to sell his Holyoke residence, and that the painting was performed to get the house ready for the market. CW-7 also stated that CW-7 stained woodwork at Joseph Asselin's newly constructed home in Amherst. Once again, the stain was located at Joseph Asselin's residence when CW-7 arrived, and CW-7 performed this work on SHA time. CW-7 recalled seeing CW-4 doing painting at Joseph Asselin's residence while CW-7 was there.

28. **Maria Serrazina's (nee Asselin) Personal Residence**

   A.  CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of his daughter Maria Serrazina at 140 Salli Circle, Ludlow, MA. CW-1 stated that SHA employees have painted the interior of Maria Serrazina's residence on several occasions. CW-1 also stated that SHA supplied the refrigerator in Serrazina's residence.

   B.  CW-3 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Maria Serrazina's personal residence. CW-3 stated that CW-4 painted and wallpapered a room at Serrazina's personal residence. CW-3 recalled that CW-3 "covered" for CW-4 on this particular job by falsely punching CW-4's SHA timecard when CW-4 worked at Maria Serrazina's residence.

   C.  CW-4 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Maria Serrazina's personal residence. CW-4 stated that CW-4 hung wallpaper at her personal residence. CW-4 also recalled having painted various rooms at Maria Serrazina's personal residence on two or three separate occasions. CW-4 performed these jobs on SHA time.

   C.  CW-7 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Maria Serrazina's personal residence. CW-7 stated that CW-7 painted at her personal residence on several different occasions since

24

approximately 1994. CW-7 stated that the paint was always located at her residence when CW-7 arrived, and that CW-7 performed this work on SHA time.

29. **Chris Asselin's Personal Residence**

   A.  CW-1 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at the residence of Chris Asselin at 184 Bowles Park Extension. CW-1 knew that SHA employees had repainted and wallpapered portions of Chris Asselin's residence. CW-1 knew that Beaulieu Roofing and Siding installed a new roof there, knew that Chris Asselin never paid for the roof, and believed that this new roof was part of the payment by Beaulieu for receiving an SHA contract. CW-1 also knew that SHA employees performed a substantial amount of yard work at Chris Asselin's home, including redoing his driveway and delivering several truckloads of loam. CW-1 also knew that Chris Asselin had new windows installed at his residence within the past two to five years, and that Chris Asselin never paid for the windows. Finally, CW-1 also believed that SHA supplied Chris Asselin with a water heater, lawnmower, and snowblower.

   B.  CW-1 previously had known that Blue Dolphin Pools had installed a pool at Chris Asselin's residence. On August 8th, 2002, CW-1 recorded a conversation with Asselin, Jr. during which Asselin, Jr. stated that Chris Asselin had only paid $10,000.00 towards the cost of the pool. Asselin, Jr. stated

25

that he knew that Asselin, Sr. had helped Chris Asselin with the cost of the pool.

C. On August 13th, 2002, CW-1 recorded a conversation involving Asselin, Sr. and Chris Asselin. I have personally listened to that recorded conversation. During that conversation, Asselin, Sr. and Chris Asselin discussed the cost of the pool. Chris Asselin stated that the pool cost $31,000.00, and that they somehow how had to come up with an additional $23,000 towards the cost of the pool.

D. CW-3 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Chris Asselin's personal residence. CW-3 knew that CW-4 painted the exterior of his personal residence.

E. CW-4 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Chris Asselin's personal residence. CW-4 stated that CW-4 hung wallpaper at Chris Asselin personal residence on three or four occasions. CW-4 also recalled having painted at Chris Asselin's residence. CW-4 performed these jobs on SHA time.

F. CW-5 also did work on the home of Chris Asselin. CW-5 moved a washer and dryer from the upstairs to the kitchen. All of this work was done on SHA time. CW-5 also knew that SHA employees were recruited to assist on various projects in connection with the Chris Asselin campaign for State

26

Representative. The projects included carpeting at campaign headquarters. CW-5 personally participated along with CW-4 and others in building campaign lawn signs using SHA materials, and driving around on SHA time in a SHA truck to place the signs in various supporters' front lawns.

  G. CW-6 stated that Asselin, Sr. used SHA resources to complete and pay for home improvements at Chris Asselin's personal residence. CW-6 stated that in 2001, CW-6 tiled the kitchen, built kitchen shelving, and worked on roof flashing at Chris Asselin's home. CW-6 stated that all of the materials were at the home when CW-6 arrived except for the lumber. CW-6 stated that CW-6 traveled to Boilard Lumber in Indian Orchard to obtain the lumber. Upon arrival at Boilard Lumber, CW-6 called CW-2 and asked for a purchase order number. When CW-2 asked what the work was for, CW-6 told CW-2 that it was for "Ray", and that CW-6 was doing work at Chris Asselin's home. According to CW-6, CW-2 subsequently gave CW-6 a purchase order number with which to buy lumber. CW-6 stated that CW-6 performed this work on SHA time. CW-6 stated that this was the first personal work that CW-6 did for Asselin, Sr., and believed that this project was a "test" for CW-6.

  H. CW-6 stated that after doing the work at Chris Asselin's home, CW-6 received another request from Asselin, Sr. to perform personal work. CW-6 stated that Asselin, Sr.

contacted CW-6 and told CW-6 to perform certain remodeling work at Chris Asselin's campaign headquarters. CW-6 stated that CW-6 laid carpeting, did some sheetrock work, moved a cooler, and installed a water fountain. CW-6 stated that SHA paid for all of the materials, and that CW-6 did all of the work on SHA time.

### III. EVIDENCE OF KICKBACKS

30. CW-3 stated that CW-3 had been offered kickbacks by contractors to insure that the contractors received their bids. CW-3 recalled that one contractor offered him $1,000.00 to help secure a bid. CW-3 stated that CW-3 refused to take the bribe, but knew that the contractor subsequently went directly to Asselin, Sr. CW-3 stated that the contractor eventually obtained the bid for which the contractor had offered CW-3 money.

31. CW-8 was aware that contractors were paying kickbacks to secure SHA contracts. CW-8 stated that a company called Camron Painting received a $125,000.00 contract from SHA to do a painting job. Shortly after receiving the contract, CW-8 was approached by an employee of Camron Painting who stated that he had been told that if he wanted any more jobs, that he had better pay Asselin, Sr. This Camron Painting employee told CW-8 that he had never done this before, and asked CW-8 if CW-8 knew how much money he was supposed to kickback to Asselin, Sr.

32. CW-8 was also aware of a painting contract involving

Forest Park that involved a kickback being paid to Sotirion. According to CW-8, the contractor had entered into a $30,000.00 contract with SHA, but Sotirion cut back on the job so that the job was no longer worth $30,000.00. However, Sotirion nonetheless paid the painter the full $30,000.00 and received $10,000.00 back for himself.

33. CW-9 has been employed at SHA for approximately five years and works as Arthur Sotirion's secretary. CW-9 stated that Sotirion has directed CW-9 to change the numbers that appear on contractor proposals/bids. CW-9 stated that after a contractor sent SHA the paperwork for a particular bid, Sotirion would ask CW-9 to make changes to the contract, such as backdating the contracts or changing the amounts being paid to the contractor. CW-9 stated once CW-9 made the changes, Sotirion then sealed the bids, and Sotirion and Asselin, Sr. then dealt with the contracts. CW-9 recalled making changes to contracts submitted by G & R Associates, Manny's Plumbing, Springfield Plumbing, ATC Associates, Valley Flooring, and Hilltop Construction. Various SHA employees have identified these companies as companies that routinely have received the winning bids for SHA contracts.

34. CW-9 also stated that CW-9 received cash from SHA vendors during the holiday season for the past five years. CW-9 identified the vendors as Gary Baribeau of G & R Construction, John Spano of Valley Flooring, and Paul Bannick, who owns a

29

chemical supply company. CW-9 stated that Baribeau, Spano, or Bannick visited Sotirion often at his SHA office, but always came by around Christmas time. CW-9 stated that immediately after Baribeau, Spano, or Bannick left Sotirion's office on these holiday visits, Sotirion would come out of his office and give CW-9 an envelope and identify the vendor who had supplied the envelope. CW-9 stated that there was cash inside the envelope. CW-9 recalled typically receiving $100.00 per year from Baribeau and $75.00 per year from Spano. CW-9 stated that Bannick brought boxes of liquor, cigarettes, and food to Sotirion frequently, but always made a holiday visit. CW-9 usually received several bottles of liquor from Bannick.

35. CW-9 further stated that Sotirion used to instruct CW-9 to do work for Baribeau, Spano, and Bannick. This included typing letters, creating advertising flyers, designing letterhead, and creating Material Safety Data sheets. CW-9 did this on SHA time. When CW-9 questioned Sotirion about this, Sotirion told CW-9 to just do it.

36. In August, 2002, Sotirion approached CW-9 and had her download her entire hard drive onto approximately thirty computer discs and two CDs. This hard drive included, among other things, the work that CW-9 had done for Baribeau, Spano, and Bannick, the contracts that had been altered, campaign flyers for the Chris Asselin campaign that CW-9 had been instructed to create, and

other items. Sotirion then instructed CW-9 to delete the entire contents of her hard drive and took possession of the computer discs and two CDs. When CW-9 advised Sotirion that the FBI wanted to interview her, Sotirion told CW-9 not to mention the cash gifts and the fact that he had instructed CW-9 to delete CW-9's entire hard drive.

37. CW-10 has been employed at SHA for approximately twenty-five years and also works as Arthur Sotirion's secretary. CW-10 also confirmed that CW-10 has received gifts from vendors for the past approximately twenty years. CW-10 indicated that initially the gifts were primarily cases of wine, but that the gifts became cash approximately five years ago. CW-10 identified the following three vendors as individuals who have provided CW-10 cash: Gary Baribeau of G & R Construction, Paul Bannick, who owns a chemical supply company, and Dan Razolia, a contractor. CW-10 stated that Baribeau, Bannick, and Razolia normally provided the cash around the holiday time, and estimated that the cash was typically approximately $50.00 to $100.00.

38. CW-10 also noted that Baribeau, Bannick, and Razolia visited Sotirion often at his SHA office. CW-10 stated that around the same time that Baribeau, Bannick, and Razolia began giving CW-10 cash, CW-10 also began receiving cash from Sotirion. CW-10 recalled receiving approximately $100.00 from Sotirion at a time, and usually received the $100.00 in a birthday card or

holiday card.

39. **Other Information**

    A. CW-1 stated that Asselin, Sr. has a basement in his home where he keeps important documentation. In April, 2002, the FBI searched James Asselin's residence at 16 Dwight Road for evidence relating to another aspect of the public corruption investigation. At the time of this search warrant, the FBI did not search for evidence relating to the present investigation.

    B. According to CW-1, after the search warrant, CW-1 heard from Janet Asselin, the wife of Asselin, Sr., that Asselin, Sr. had emptied out the safe into a briefcase. Asselin, Sr. took the briefcase to Asselin, Jr.'s residence and told his son to hide the briefcase. Asselin, Sr. told Asselin, Jr. that there was $100,000.00 in cash in the briefcase. Asselin, Jr. looked inside the briefcase and confirmed the presence of large amounts of cash.

    C. According to CW-1, who received this information from Asselin, Jr., Asselin, Jr. assisted Asselin, Sr. in moving the briefcase from 40 Santa Maria Drive to Maria Serrazina's house in Ludlow where they hid the briefcase in her attic on or about May 9th, 2002. Asselin, Jr. advised CW-1 that he personally observed Asselin, Sr. count out $47,000.00 in cash from the briefcase. Asselin, Sr. advised Asselin, Jr. that the $47,000.00 was "Art's" money, which Asselin, Jr. and CW-1

32

understood to be a reference to Arthur Sotirion. Asselin, Jr. also told CW-1 that the briefcase contained a book, which appeared to Asselin, Jr. to be some type of sports bookmaking records.

    D.    As late as August 8th, 2002, Asselin, Jr. confirmed to CW-1 that the briefcase was still at Maria Serrazina's residence. On August 8th, CW-1 recorded a conversaion with Asselin, Jr. Asselin, Jr. confirmed that the money was still at Serrazina's, and also confirmed that a portion of the cash belonged to Arthur Sotirion. I have personally listened to that recorded conversation.

## IV. ITEMS TO BE SEIZED

    40.    Based on my training and experience, I know that employees at government offices commonly maintain records at their work stations to include Rolodexes, appointment calenders, copies of business correspondence, copies of contracts, meeting notes, daily planners, personal diaries, personal handwritten notes, and floppy disks. These all of these items will assist in documenting meetings between Asselin, Sr., Sotirion and vendors and corroborate the payment of kickbacks.

    41.    Based on my training and experience, I know that individuals commonly maintain financial documents in their homes. These records include records of expenditures, such as banking

statements, canceled checks, credit card statements, credit card receipts, home improvement records, receipts, invoices, and other similar types of records. These personal financial records will assist in proving the source of payment for particular home improvement projects and materials and in showing the lack of available funds and/or financial resources to pay for certain home improvement projects and materials in cash. The lack of certain financial records, such as the lack of canceled checks and credit card charges, also will tend to prove that SHA paid for certain home improvement projects and items and show no personal re-imbursement by Asselin family members to SHA.

42. I anticipate that the following items will be located at the locations described above:

A. Contracts, estimates, permits, receipts, invoices, delivery tickets, packing slips, handwritten notes, and any other documents relating to the request, ordering, delivery, construction, and/or completion of home improvement projects and/or materials;

B. Paint/stain samples, paint/stain can labels, wallpaper and/or remnants, carpet and/or carpet remnants, tile and tile remnants, roofing remnants, and other home improvement materials;

C. Financial records, such as personal checking accounts, home equity lines, bank statements, credit card

34

statements, credit card receipts, cancelled checks, and any other documents showing the lack of personal expenditure and reimbursement for home improvements projects and/or materials;

D. Water heaters, appliances, power tools, lawn mowers, snowblowers, and any other items bearing SHA bar code numbers and/or identifying information or partially or completely obliterated serial numbers.

E. Any and all documents relating to the payments and/or receipt of kickbacks, gifts, gratuities, and/or things of value from SHA vendors, including, but not limited to, Rolodexes, appointment calenders, business correspondence, draft and final contracts, estimates, meeting notes, daily planners, personal diaries, personal handwritten notes, and cash.

V. CONCLUSION

43. For the foregoing reasons, this Court is respectfully requested to authorize the search of the premises described above and the seizure of the items described in the Attachments hereto.

_____
CLIFFORD W. HEDGES
Special Agent, FBI

Sworn to before me and subscribed in my presence on the 26th day of September, 2002.

_____
UNITED STATES MAGISTRATE JUDGE

35

## ATTACHMENT A - ITEMS TO BE SEIZED

A. Contracts, estimates, permits, receipts, invoices, delivery tickets, packing slips, handwritten notes, and any other documents relating to the request, ordering, delivery, construction, and/or completion of home improvement projects and/or materials;

B. Inventory, videotape, photograph and seize, where appropriate, paint/stain samples, paint/stain can labels, wallpaper and/or remnants, carpet and/or carpet remnants, tile and/or tile remnants, roofing and/or roofing remnants, windows, rooms, contents of rooms, and any other home improvement projects and/or materials;

C. Financial records, such as personal checking accounts, home equity lines, bank statements, credit card statements, credit card receipts, cancelled checks, shredding machines, shredded items, and any other documents relating to the availability of financial resources, or lack thereof, for personal expenditure on and/or re-imbursement of home improvements projects and/or materials;

D. Inventory, videotape, photograph, and seize, where appropriate, water heaters, refrigerators, stoves, power tools, lawn mowers, snowblowers, window labels, manufacturer labels, contents of rooms, and any other furnishings, appliances, and/or tools bearing SHA bar code numbers, serial numbers, partially or completely obliterated serial numbers, or other identifying information.

E. Any and all documents and/or physical items relating to the payments and/or receipt of kickbacks, gifts, gratuities, and/or things of value from SHA vendors, including, but not limited to, Rolodexes, appointment calenders, business correspondence, draft and final contracts, estimates, meeting notes, daily planners, personal diaries, personal handwritten notes, briefcases, and cash.