UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30033-MAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RAYMOND ASSELIN, SR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S RESPONSE TO
DEFENDANT SERRAZINA'S MOTION FOR SEVERANCE

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and William M. Welch II, Assistant United States Attorney, hereby files this response to defendant Serrazina's Motion for Severance under Rule 14.

Defendant Serrazina' motion should be denied because she has not satisfied all of the first-tier or second tier Drougas factors. Moreover, any alleged prejudice from a joint trial is no greater than the possible prejudice inherent in a joint trial and certainly curable through cautionary jury instructions.

I.  The Court Should Not Sever Defendant Serrazina's Trial Because She Has Not Made A Sufficient Showing That A Bona Fina Need Exists For The Testimony Or That The Proffered Exculpatory Evidence Is Credible Enough For A Severance.

"There is a strong preference in the federal system for jointly trying defendants involved in related crimes." United States v. Sotomayor-Vazquez, 249 F.3d 1, 16-17 (1st Cir. 2001).

1

The First Circuit previously has recognized on several occasions the general rule that "`defendants charged in the same indictment should be tried together.'" United States v. Capleton, 350 F.3d 231, 239 (1st Cir. 2004)(quoting United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001). A defendant "is not entitled to severance merely because he may have a better chance of acquittal if tried separately." United States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997)(citing Zafiro v. United States, 506 U.S. 534, 540 (1993)).

"Separate trials are not warranted unless `there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.'" Sotomayor-Vazquez, 249 F.3d at 16-17 (quoting Zafiro, 506 U.S. at 539). The First Circuit reverses "a decision to deny a motion for severance only upon a showing of strong prejudice, demonstrating a manifest abuse of discretion that deprived the defendant of a fair trial." United States v. Nason, 9 F.3d 155, 158 (1st Cir. 1993).

Where a defendant seeks a severance based upon the need to present the exculpatory testimony of a co-defendant, "a defendant must show that the proffered testimony is genuinely necessary, exculpatory, and will in fact be forthcoming in a severed trial." United States v. Hurley, 63 F.3d 1, 17 (1st Cir. 1995)(citing United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984)). To

2

make such a showing, the defendant initially must demonstrate the "first-tier Drougas factors": "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed." United States v. Smith, 46 F.3d 1223, 1231 (1st Cir. 1994); Nason, 9 F.3d at 158. The First Circuit has not addressed whether or not an offer to testify conditioned on the order of the separate trials satisfies the co-defendant's availability under the first-tier Drougas factors. Smith, 46 F.3d at 1231 n.3 (stating that "[w]e note, however, that several of our sister circuits have ruled that an offer to testify, conditioned on one defendant being tried before the other, fails to satisfy the elements of a *prima facie* case for severance.")(citations omitted).

Assuming that a defendant makes the first showing, the district court then must consider the "second-tier Drougas factors." Id. To establish the "second-tier Drougas factors," "the district court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion." Id.; Nason, 9 F.3d at 158.

Defendant Serrazina's motion should be denied because it is

inadequate as a matter of law.  As an initial matter, the Government assumes that defendant Serrazina and her co-defendant(s) conditioned her motion for severance upon the order in which she and her co-defendants are tried, i.e. defendant Serrazina tried last.  In this way, her co-defendants would have resolved their cases and would not have any fear of incriminating themselves while testifying for their daughter or sister.

If defendant Serrazina and her co-defendant(s) have not conditioned her severance motion upon the order of their trials, then there is no reason to grant a severance because it means that her co-defendants do not have a real Fifth Amendment fear of self-incrimination.  If her co-defendants do not care if defendant Serrazina's trial proceeds first, then her co-defendants must know that their testimony could be used against them at a later trial.  Their Fifth Amendment concerns then would be no different in a separate trial or a joint trial.

Under either scenario, defendant Serrazina's request in and of itself should be deemed insufficient as a matter of law.  If defendant Serrazina and her co-defendants are demanding that they be tried in a particular order, then it does not mean that her co-defendant(s) are truly available. See United States v. Ford, 870 F.2d 729, 731 (D.C. Cir. 1989)(holding that "[o]ur sister circuits have concluded, rightly we believe, that `Rule 14 [should not be read] as a mechanism for alleged co-conspirators

4

to control the order in which they are tried.'" (citations omitted)).[1] If they are not demanding separate trials in a particular order, then this undermines the legal basis for the motion for severance and reveals that the motion is really an attempt to increase their perceived chance of an acquittal for their sister or daughter. See Rogers, 121 F.3d at 16 (defendant not entitled to severance because of a "a better chance of acquittal if tried separately."). It should be apparent that defendant Serrazina and her co-defendants want to dictate to the court not only the order of trials, but also the number of trials. Indeed, if the court permits defendant Serrazina to be tried alone, the court will be hard-pressed not to grant separate trials for virtually all of the defendants.

Second, defendant Serrazina never sufficiently demonstrated as a matter of law that her co-defendant(s) in fact would testify or what their expected testimony would be. Defendant Serrazina has filed sealed affidavits from co-defendant(s) that the Government has not seen and the veracity of which the Government cannot test. The Government has no way of measuring the need of the testimony, the substance of the testimony, or the true

---

[1] In fact, if their Fifth Amendment fears were truly genuine, then the co-defendants would retain their Fifth Amendment privileges through the time of their sentencings, which would occur approximately four months after their convictions, thus delaying defendant Serrazina's trial for approximately four months.

exculpatory nature of the testimony. At best, defendant Serrazina's motion provided nothing more than sanitized, conclusory statements that do not establish the need, substance or exculpatory nature of the co-defendant(s) testimony. See Smith, 46 F.3d at 1232 (citing Ford, 870 F.2d at 732 (holding that conclusory statements did not meet burden of establishing the exculpatory `nature and effect' of the co-defendant's testimony).

The court is left in the position of ruling on a motion without the benefit of the Government's full input, or based upon possibly misleading facts or outright false statements contained within the affidavit(s). Given the presumably conditional guarantee of the co-defendant(s) testimony, the lack of any unsealed affidavits, and the conclusory nature of the expected testimony, the court should deny defendant Serrazina's motion as a matter of law.

Assuming arguendo that the court deemed defendant Serrazina's motion sufficient as a matter of law, defendant Serrazina factually has not met at least one of the first-tier Drougas factors. Defendant Serrazina has not shown a "bona-fide need" for the testimony. First, when the federal agents executed the search warrant at defendant Serrazina's house and showed her the briefcase, she denied any knowledge of the briefcase's existence. As Exhibit A reflects, the Government sent a

6

discovery letter to defense counsel memorializing this statement. The Government does not object to the admission of this statement. See Exhibit A. Second, as defendant Serrazina concedes, a tape exists between co-defendant Raymond Asselin, Jr. (hereinafter "defendant Asselin, Jr.") and ex-wife, Lisa, that is exculpatory in the eyes of defendant Serrazina. See Motion, p. 3-4. Defendant Serrazina can admit and play the tape at a joint trial without calling defendant Asselin, Jr. as a witness. Finally, depending upon the substance of the sealed affidavits, the Government may have no objection to the affidavits being admitted into evidence. Of course, assuming their admission into evidence, the affidavits would be subject to other applicable rules of evidence, e.g. double hearsay.

Defendant Serrazina also has not established the second-tier Drougas factors. Most importantly, defendant Serrazina did not and cannot establish the second element of the second-tier Drougas factors: the court's consideration of "whether the testimony would be subject to substantial, damaging impeachment." See Motion, p. 6. Defendant Serrazina sealed her co-defendant(s)' affidavits for good reason: she knew that her co-defendant(s) are subject to impeachment so damaging that it would render their testimony non-credible.

For example, defendant Asselin, Jr.'s taped statements to his wife are not nearly as exculpatory as represented by

7

defendant Serrazina. A true and accurate transcription of defendant Asselin, Jr.'s statements are as follows:

> LA: Do you think your father told Maria that bag was in the attic?
>
> RA, Jr.: <u>I don't know</u>. In fact, she freaked out.

(emphasis added). In fact, defendant Serrazina did not "freak out" when federal agents seized the briefcase from her attic. As reflected in Exhibit A, defendant Serrazina showed no surprise and appeared calm throughout the entire search, even when the federal agents showed defendant Serrazina the briefcase and counted the contents -- $240,000.00 in cash --in front of her. Morever, assuming co-defendant Asselin, Jr. submitted an affidavit under seal, his taped statement in October, 2002 that "he didn't know" if defendant Serrazina knew about the briefcase in her attic would stand in stark contrast to any affirmative testimony today that defendant Serrazina had not been told about and had no knowledge of the briefcase.

Defendant Asselin, Jr. also would be subject to vigorous impeachment regarding his character and truthfulness generally. For example, after defendant Asselin, Jr.'s ex-wife had been served a subpoena to testify before the grand jury, defendant Asselin, Jr. "counseled" his ex-wife about her testimony before the grand jury. Defendant Asselin, Jr.'s ex-wife taped those conversations. A true and accurate transcription of defendant Asselin, Jr.'s statements during a portion of the conversation

...

are as follows:

    LA:[2]        Oh my God.

    RA, Jr:      Just don't lie.

    LA:         I'm not going to lie.

    RA, Jr.:     Or if you lie, don't ever say the truth after that. That's the thing. If you stick with it, and they can't prove it, well then there's nothing there. But it's when you change your story.

    LA:         But what if one person says one thing and the other says another thing. That's how that girl got caught.

    RA, Jr.:     Yup, then it's your word against theirs.

A little bit further in the same conversation, defendant Asselin, Jr. then advised his ex-wife as follows:

    RA, Jr.:     Do you remember on whatever date that you said this? All you got to say is `I don't know' or `I don't remember' and they can't do anything. When you say you don't know or you can't remember, you can't remember. They can't prove you can't remember.

    LA:         Yeah.

    RA, Jr.:     You definitely don't want to . . .

    LA:         That's good.

    RA, Jr.:     Yeah, you can't remember, I don't remember, or I don't know. That's all you got to say, man. You could answer every question with `I don't know',`I don't remember.'

    LA:         Now I'm feeling better.

---

[2] "LA" refers to Lisa Asselin. "RA, Jr." refers to defendant Raymond Asselin, Jr.

    RA, Jr.:    Well remember that at that time.

    LA:    I'm sure you'll remind me.

Further in the same conversation, defendant Asselin, Jr. "counseled" his ex-wife as follows:

    LA:    I didn't think Art was in the kettle until you told me.

    RA, Jr.:    Well, he, I mean, . . .

    LA:    I didn't realize that until you told me that money was for him.

    RA, Jr.:    Yeah.

    LA:    Then I was like, `Wow.' Especially when you said it was that much money.

    RA, Jr.:    40 grand.

    LA:    47. You said you counted 47.

    RA, Jr.:    Alright, well you don't know that.

    LA:    Ah, ah, ah, ah. I know nothing.

    RA, Jr.:    That ain't shit that you can say, baby. Because you don't know. I don't know. Not to my knowledge, I am unaware of that.

    LA:    If they ever say anything about a suitcase being in our house, `Nope.'

    RA, Jr.:    Nope.

    LA:    I don't know of any suitcase.

    RA, Jr.:    Nope.

Defendant Asselin, Jr. and his ex-wife knew about the briefcase because, prior to the briefcase having been re-located to defendant Serrazina's house, the briefcase had been hidden in the

attic of defendant Asselin, Jr. and his ex-wife. The references to "47" and "Art" relate to defendant Asselin, Jr. and his ex-wife's knowledge that $47,000.00 in cash had been taken out of the briefcase for co-defendant Arthur Sotirion prior its relocation in defendant Serrazina's house.

Finally, in addition to that impeachment evidence, defendant Asselin, Jr.'s ex-wife also tape recorded her former husband as he shred documents that defendant Asselin, Jr. feared may link him and his family to the Springfield Housing Authority fraud. A true and accurate transcription of just a portion of defendant Asselin, Jr.'s actions and statements are as follows:

> RA, Jr.: Shredding that. [Sound of shredder]. I didn't know I had all this shit here. R & L. 92.
>
> LA: Oh my God. 92. What's that? Those are all 92.
>
> RA, Jr.: Look at this. 25 Saab Court.[3] [Sound of shredder]. That's the kind of shit that they look for right there.
>
> LA: Why? That doesn't say that you own anything.
>
> RA, Jr.: No. 25 Saab Court. It says that I did some work for them.
>
> LA: So. You did work for them.
>
> [Sound of shredder].
>
> LA: Maybe you should show your father those and you shouldn't be shredding them, Ray.

---

[3] 25 Saab Court is the address for the administrative offices at Springfield Housing Authority.

11

|||
|---|---|
| | Because then if he has records too. You think just because you're shredding them he doesn't have a copy of that? They probably have a copy of that. |
| RA, Jr.: | You're right. |
| LA: | So then he could take this and get the numbers and pull them. |

Despite his ex-wife's advice, defendant Asselin, Jr. continued to shred as follows:

|||
|---|---|
| RA, Jr.: | Ray Asselin. His son's house. See. These are gone. |
| | [Sound of shredder] |
| RA, Jr.: | Anything else in there? |
| LA: | What's this? |
| RA, Jr.: | That, that's my mother's writing. |
| LA: | Oh. |
| RA, Jr.: | What is that? Alright, so this all we can keep then. |
| LA: | This is, this is her, I think this is her wallpaper in her bathroom and stuff. I don't know. |
| RA, Jr.: | Did you go through all this now? |
| LA: | Yeah. |
| RA, Jr.: | Alright. I'm just going to trash that. I'm just going to, ah, probably [unintelligible] really incriminating there. |

The above snippets are just a small portion of the impeachment evidence available against defendant Asselin, Jr.

Defendant Raymond Asselin, Sr. (hereinafter "defendant

12

Asselin, Sr.") similarly would not be immune from substantial, damaging impeachment that would render his testimony not believable. For example, the Government would put on evidence that members of the Asselin family, including defendant Asselin, Sr. and defendant Serrazina, decided that they would attribute the existence of the briefcase and the $240,000.00 in cash to defendant Serrazina's deceased husband, Jack Serrazina, and his alleged gambling problem. See Exhibit B. Of course, the Government would show that Jack Serrazina in fact did not have a gambling problem.

Like defendant Asselin, Jr., defendant Asselin, Sr. also would be subject to vigorous impeachment regarding his character and truthfulness generally. For example, after grand jury subpoenas had been served upon several of the Asselin wives, defendant Asselin, Sr. retained Attorney John Ferrara to represent all of them and arranged for Attorney Ferrara to meet all of them. Prior to their meeting, defendant Asselin, Sr. and his wife, Janet Asselin, met with defendant Asselin, Jr. and his ex-wife to go over what she would tell Attorney Ferrara as follows:

> RA, Sr.:[4] Lisa this is the story. Ah, Maria and mother went in to see this lawyer today, John Ferrera, who I've asked . . .

---

[4] "RA, Sr." refers to defendant Raymond Asselin, Sr. "JA" refers to defendant Janet Asselin.

13

| | |
|---|---|
| JA: | Ferrera. |
| RA, Sr.: | Ferrera. Who I've asked . . . |
| LA: | Portugese? |
| RA, Sr.: | To represent the six women going in. He doesn't know if he can do it all, but what he wants to is have a preliminary meeting with all six. Mother and Maria started today, mother, daughter deal. And they're going to explain to you the whole, you know, he'll explain the process, what the 5th means, what happens after the 5th if you have to go back and all of this stuff. But basically he's going to quiz you. And we got nothing to go on. We don't know what it is. We, I have not been contacted. |
| LA: | Okay. |
| RA, Sr.: | We don't know if it's the election, we don't know if it's this, we don't, construction, we don't know what it's about. |
| RA, Jr.: | You have to assume its everything. |
| RA, Sr.: | So we have to assume its everything. So an easy one is the, is the, ah campaign, ah, because you guys really don't know anything about the campaign. Mean, were there Housing Authority people there? Yeah, my brother was, works for the Housing Authority. |

The "campaign" refers to co-defendant Christopher Asselin's state representative campaigns.

Lisa Asselin will testify that she worked on co-defendant Christopher Asselin's campaigns and handled the checkbook for the campaign account for the first two campaigns, but eventually relinquished that task to defendant Janet Asselin. Lisa Asselin further will testify that, among other things, she knew that: (1)

defendant Asselin, Sr. used SHA personnel and resources on co-defendant Christopher Asselin's campaigns; (2) gave cash to individuals so that they in turn could donate money in the form of personal checks to co-defendant Christopher Asselin's campaigns, thereby evading Massachusetts campaign finance laws; (3) accepted illegal cash contributions that were never disclosed on co-defendant Christopher Asselin's campaign finance reports; and (4) her husband, defendant Asselin, Jr., was the treasurer of the campaign in name only.

Despite her extensive knowledge about illegal activities involved in co-defendant Christopher Asselin's campaigns, defendant Asselin, Sr. instructed Lisa Asselin as follows:

> RA, Sr.: But anyway, in the campaign, you know, my husband is the treasurer, he handles all, you know, some of the checks, some of the reports. I don't even look at them.
>
> LA: Okay.
>
> RA, Sr.: I give checks, ah, you know, I handle some of the checkbook items. I doubt that, do you do that anymore?
>
> LA: I just balance the checkbook. I get the statements in.
>
> RA, Sr.: Yeah, and balance the checkbook.
>
> LA: But that's it. I don't see . . .

The conversation then moved to renovations performed on defendant Asselin, Jr. and Lisa Asselin's residence. Lisa Asselin will testify that, among other things, she knew that:

15