(1) defendant Asselin, Sr. used SHA personnel and resources to make free home improvements on her residence and other residences belonging to members of the Asselin family; and (2) had SHA vendors supply free goods and materials for home improvements at her residence and other residences belonging to members of the Asselin family.

Once again, despite her extensive knowledge of these illegal activities, defendant Asselin, Sr. instructed Lisa Asselin as follows:

> RA, Sr.: On the construction end, there's really nothing that you know anyway except for the deck that you know Frank did it off duty.
>
> LA: It was weekends.
>
> RA, Sr.: Weekends.
>
> LA: He was here Saturdays.
>
> RA, Sr.: How much did he pay for it? I have no idea. My husband takes care of all those. Don't you write checks?
>
> LA: I do all the bills.
>
> RA, Sr.: You do your monthly bills. You don't do your big ones.
>
> JA: He asked me same questions.
>
> LA: I do everything.
>
> RA, Sr.: Well, you don't . . .
>
> JA: Well, don't say that.
>
> RA, Sr.: Not, not, not this.
>
> LA: Oh okay, okay.

16

RA, Sr.:   This is different.

LA:        I don't do home improvements.

RA, Jr.:   [Unintelligible].

JA:        You do your monthly bills.

RA, Jr.:   This is a cash deal anyway.

RA, Sr.:   Right. And say, you know, my husband handles anything like that. We haven't done anything to speak of except for a deck.

LA:        Okay.

RA, Sr.:   And, and a whirlpool.

LA:        Yeah.

RA, Sr.:   Right.

LA:        We . . .

RA, Sr.:   And we did those. The whirlpool was a big thing. It cost a lot of money. The deck was right next to the whirlpool. This guy Frank who we know was an excellent carpenter. We wanted him to do it. We begged him to do it.

LA:        He was for, working with P.I. too.

RA, Sr.:   Yeah, but, you know, he was, on this particular job he was working alone for himself. I don't know who his helper was.

RA, Jr.:   Me.

RA, Sr.:   There you go. Ray was his helper. And, ah . . .

RA, Jr.:   Since I designed it.

RA, Sr.:   And I paid, ah, labor and materials. I gave him the money for, that would be Ray, if there's a second round. But as far as you're concerned, this deck was done by Frank. Ray paid him cash, which he did . . .

17

        LA:        Okay.

The reference to "Frank" is Frank Higginbotham, a former SHA employee who performed home improvements on SHA time at the various personal residences of the Asselin family. Higginbotham is now deceased. The reference to "P.I." is a SHA contractor, who is also deceased.[5] The materials for the deck were actually paid by SHA and a SHA contractor.

The conversation between defendants Asselin, Sr., Janet Asselin, and Asselin, Jr., and his ex-wife Lisa continued as follows:

    RA, Sr.:    With, for labor and materials. Both. Anything else on your house? I don't think so.

    RA, Jr.:    Roof, windows.

    RA, Sr.:    Well, and that was Dave, wasn't it? Yeah. Not that I know of.

    LA:    Okay.

    RA, Sr.:    Not that I know of. My husband handles all the big things.

    JA:    He'll ask you, he will definitely ask you if Ray Descoteau [unintelligible].

    RA, Sr.:    Yeah.

    LA:    Worked for us?

    JA:    Yeah.

---

[5] The Government will put on evidence that members of the Asselin family have consistently tried to explain away their fraud by invoking the names of deceased individuals because, in the words of one of the Asselins, "dead men don't talk."

>   RA, Sr.:   Yeah, here.
>
>   JA:        No.
>
>   RA, Sr.:   Never . . .
>
>   LA:        I did, I did . . .
>
>   RA, Sr.:   Ray never came here.
>
>   LA:        I mean, they can see, I did the feather painting.
>
>   RA, Sr.    Yeah, you did all, no, Ray Descoteau, I know, we knew him in the family, but he never did any work for me.
>
>   LA:        Okay.
>
>   RA, Sr.:   Never.

"Ray Descoteau" is a former SHA painter who painted all of the personal residences of the Asselin family on SHA time on various occasions.

The amount of additional impeachment against defendant Asselin, Sr. and other members of the Asselin family is extensive.[6] To summarily state that "the testimony of the co-

---

[6] The Government has no idea which co-defendants submitted sealed affidavits. However, if one of the sealed affidavits has been signed by co-defendant Christopher Asselin, the Government will play taped conversations in which he discussed seeking retribution against Government witnesses as follows:

>   CA:        But, you know, you got these people, and you've got to understand that, when this is all over, when this is all over, Dad, you got to bring in the people that you can really trust and go through each person now that that woman is gone, and you hired these people, all the scumbags and dirtbags who tried to do you in, you got to take care of them.

19

defendant(s) will not be subject to substantial damaging impeachment on the issues to which they will testify" is laughable. See Motion, p. 8.

Finally, a severed trial will be a heavy drain on judicial and prosecutorial resources.  A severed trial will require the Government to prove the allegations in the Superseding Indictment twice or even three times if defendant Serrazina is tried by herself.  At a joint trial and a severed trial, the Government essentially would put on the same evidence and call the same number of witnesses at all of these trials.  The Government would still call the same SHA contractors to testify that defendants Asselin, Sr. and/or Sotirion solicited bribes for the enrichment of themselves personally or their family members; the same third party witnesses to show the expenditure of the bribes on goods and materials for home improvements at the personal residences of members of the Asselin and Sotirion families; the same SHA employees to describe the work that they did on SHA time at the

---

    RA, Jr:    Yeah.

    CA:        Don't sit back and let them just walk all over us.

    RA, Sr.:   You're absolutely right, but I will that in due course;

or, portions of conversations in which he stated that he would attempt to have a former state representative, Paul Tirone, contact his sister, an employee of the FBI, and have her illegally obtain information on the case agent, FBI Special Agent Cliff Hedges.

20

various Asselin and Sotirion personal residences; and Lisa Asselin and Ann Asselin to establish the various defendants' knowledge and intent. Therefore, a severed trial would not be in the interest of judicial economy.

## II. The Court Should Not Sever Defendant Serrazina's Trial Because The Risk Of Spillover Prejudice Is Not Any Greater Than The Risk Inherent In Any Multiple Defendant Case With Appropriate Cautionary Instructions.

The First Circuit's "rule is that those `who are indicted together should be tried together.'" United States v. DeLeon, 187 F.3d 60, 63 (1st Cir. 2001)(quoting United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993)). "The federal courts have long recognized that consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants.'" United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1999)(quoting United States v. Josleyn, 99 F.3d 1182, 1188 (1st Cir. 1996).

To prevail upon a severance motion based upon a claim of prejudicial spillover, "a defendant must show that the joinder of offenses here resulted in `actual prejudice,' which we define as the `substantial and injurious effect or influence in determining the jury's verdict.'" United States v. Melendez, 301 F.3d 27, 36 (1st Cir. 2003)(quoting United States v. Edgar, 82 F.3d 499, 508 (1st Cir. 1996)). To overcome the district court's presumption in favor of joinder, the prejudice must be "so pervasive that it

21

would be likely to effect a miscarriage of justice." DeLeon, 187 F.3d at 63 (citing United States v. Pierro, 32 F.3d 611, 615 (1st Cir. 1994)). "This requirement means more than establishing that the defendant might have had a better chance of acquittal in a separate trial." DeLeon, 187 F.3d at 63 (citing Zafiro, 506 U.S. at 540). It also means establishing a level of prejudice greater than that inherent in trying multiple counts and multiple defendants together in any joint trial. DeLuca, 137 F.3d at 36; Rose, 104 F.3d at 1415; United States v. Yefsky, 994 F.2d 885, 896 (1st Cir. 1993).

Therefore, the fact that a co-defendant may have engaged in other bad acts, including acts of violence, does not suffice to establish "actual prejudice." DeLeon, 187 F.3d at 63 (holding that repeated inquiries about third-party fear based on co-defendant's violent nature and co-defendant's prior drug conviction did not warrant severance); DeLuca, 137 F.3d at 37 (evidence of violent assault by co-defendant not warrant severance for defendant). The relative disparity between the weight of the evidence between defendants also does not warrant severance. Id. (citing United States v. Rawwad, 807 F.2d 294, 295 (1st Cir. 1986)(stating that "[t]he difficulty with this argument lies in the case law holding to the contrary.")).

In this case, defendant Serrazina makes precisely the same arguments that the First Circuit routinely has rejected in these

22

types of severance claims. "`First, a measure of evidentiary spillover is a foreseeable concomitant of virtually every joint trial, yet seldom indicates undue prejudice.'" DeLuca, 137 F.3d at 36 (quoting Yefsky, 994 F.2d at 896). Motions for severance have been denied in other cases involving more lurid crimes, such as murder, which have been admitted against one defendant, but not against other defendants. See e.g. United States v. Delpit, 94 F.3d 1134, 1143-44 (8th Cir. 1996)(murder for hire); United States v. Anderson, 89 F.3d 1306, 1312 (6th Cir. 1996)(murder and attempted murder); United States v. DeVillio, 983 F.2d 1185, 1192 (2nd Cir. 1993)(attempted murder); United States v. Alvarez, 755 F.2d 830, 858 (11th Cir. 1985)(murder of federal agent). As a conspirator, defendant Serrazina is bound by the statements and actions of her co-conspirators. Defendant Serrazina's complaints of undue prejudice are no different than those inherent in any conspiracy trial.

Moreover, defendant Serrazina would not be unduly prejudiced by the introduction of evidence of the bribery scheme because defendant Serrazina knew about the magnitude and scope of the bribery scheme. See Motion, pgs. 14-15. The evidence will establish that defendant Serrazina and her co-defendants openly and regularly discussed the various goods and materials that they received for free through SHA and from SHA contractors for approximately fifteen years. See Exhibit C. Indeed, as Exhibit C

reflects, jealousy and sibling rivalry at times caused various family members to demand more in the form of home renovations. The fact that one family member received an appliance for free, or had home improvements performed on their residence, explains why defendant Serrazina at times demanded improvements on her residence.

In addition, as defendant Serrazina's motion makes clear, defendant Serrazina's sole defense is lack of intent and knowledge. Given that intent and knowledge are essential elements of the crimes charged, the Government is entitled to show that the full breadth of defendant Serrazina's knowledge of the bribery and fraud scheme. If one member of the Asselin family discussed at the dinner table a SHA employee doing work on his or her home, or receiving something for free from a SHA contractor, in defendant Serrazina's presence, that evidence is relevant because it tends to show defendant Serrazina's knowledge and intent. A jury is less likely to find that defendant Serrazina believed that she personally received "legitimate family gifts", see Motion, pg. 7, when she not only participated in family discussions about other family members' receiving various goods and materials for free through SHA or SHA contractors, see e.g. Motion, pg. 18 (an in-ground swimming pool, construction of a new house, a new boat), but also personally benefitted from the fruits of the fraud and bribery schemes.

Therefore, although the bribery and fraud schemes may be "massive", the breadth of defendant Serrazina's knowledge of the bribery and fraud scheme was equally as extensive.[7]

Defendant Serrazina also suggests that another basis for severing her trial from defendants Asselin, Sr., Sotirion, Davis, Bannick and Spano is because, unlike the defendant family members, the state of mind of the SHA contractors will not be an issue. Instead, "the issue at trial will simply be whether such illegal gratuities will be provided." See Motion, pg. 16 n.14. If defendant Serrazina suggests that these defenses are somehow so antagonistic to require a severance, they are not.

To succeed with a motion for severance based upon antagonistic defenses, a defendant must demonstrate "that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts." Capleton, 350 F.3d at 239 (citing United States v. Pena-Lora, 225 F.3d 17, 34 (1st Cir. 2000)). "[A]ntagonistic defenses only require severance if the tensions between the defenses are so great that the finder of

---

[7] To suggest that defendant Serrazina is less culpable really does not square with the evidence. Much of the fraud and the majority of all of the bribes obtained by defendants Asselin, Sr. and Sotirion funded home improvements for their children. Even the theft of quarters or bribes obtained in the form of cash benefitted the children. The Government will put on evidence, for example, that Asselin, Sr. gave anywhere between $5,000.00 and $10,000.00 in cash annually at Christmas to each one of his children, causing them to question the legitimacy of the source of the cash.

25

fact would have to believe one defendant at the expense of the other." Unites States v. Rose, 104 F.3d 1408 (1st Cir. 1997)(citing Smith, 46 F.3d at 1230).

In this case, a jury could easily find the existence of both theories of defense. It is entirely plausible for the jury to find that the SHA vendors did not pay illegal gratuities and that the defendant family members had no knowledge of any illegal gratuities. It is equally likely that the jury could find that the SHA vendors knowingly paid illegal gratuities, but that the defendant family members had no knowledge of the payment of any illegal gratuities. At best, these defenses are only different, neither of which warrants a severance in this case. See Rogers, 121 F.3d at 16 (affirming denial of motion for severance were defenses were "not antagonistic, merely different."). See also Serafino, 281 F.3d at 239 (affirming denial of motion for severance where defenses merely "somewhat antagonistic."). The difference in the defenses is not so conceptually difficult to prevent the jury from understanding both.

Defendant Serrazina also claims that she will suffer prejudicial spillover from false income tax return charges and suggests that these charges will unduly lengthen the trial. Neither of these claims is true. There will be no detailed analysis of income and expenditures. The tax charges are very straightforward: defendants Asselin, Sr. and Janet Asselin did

26

not report their bribe and fraud income on their federal income tax returns, and defendant Bannick never reported his SHA income on his income tax returns. The former charges are easily proven because defendants Asselin, Sr. and Janet Asselin only reported W-2 wage income on their income tax returns. The latter charges are easily proven because defendant Bannick cashed all of his SHA vendor checks, never deposited the cash into his business bank account, and never told his tax return preparer, who is his son-in-law, about his SHA income. Because the witnesses who prove the bribery and fraud schemes also establish the unreported income, the Government would call those witnesses anyway in a severed and joint trial.

The campaign fraud charges are properly joined against defendant Serrazina. The Government will put on evidence that defendant Serrazina was one of the individuals to whom defendant Asselin, Sr. gave cash, and who in turn wrote a personal check to make it appear as if she had donated her own money to her brother's campaign.

Finally, the district court can protect against the possibility of spillover prejudice by instructing the jury to consider the evidence separately as to each charge and each defendant. See Houle, 237 F.3d at 76 ; Rogers, 121 F.3d at 16 (stating that the district court "scrupulously instructed the jurors that they must consider the evidence as to each charge and

each defendant separately."). The First Circuit repeatedly has upheld denials of severance motions where "the district court took appropriate measures to safeguard against potential spillover prejudice by instructing the jury to consider separately the charges and the evidence as to each defendant." DeLeon, 187 F.3d at 63 (citations omitted).

### III. Conclusion

Based upon the foregoing, the Government respectfully requests that the court deny defendant Serrazina's Motion to Sever.

Filed this 10th day of February, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

*/s/ William M. Welch II*
WILLIAM M. WELCH II
Assistant United States Attorney

CERTIFICATE OF SERVICE

Hampden, ss.                                    Springfield, Massachusetts
                                                February 10, 2006

    I, William M. Welch, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by mailing said motion to:

all defense counsel of record

_____
WILLIAM M. WELCH II
Assistant United States Attorney